# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| U.S. SECURITIES HOLDINGS, INC., et al.,<br>　　　Plaintiffs,<br><br>　　　　　v.<br><br>RANDY ANDREWS,<br>　　　Defendant. | CV 21-2263 DSF (MRWx)<br><br>Findings of Fact and Conclusions of Law After Court Trial |

　　　This matter was tried to the Court on March 15-16, 2022. Having heard and reviewed the evidence, observed the credibility of the witnesses, and considered the parties' post-trial submissions, the Court makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT[1]

### A.　The Stock Purchase Agreement

　　　1.　　Plaintiffs U.S. Securities Holdings, Inc. and U.S. Security Associates Holdings Inc. (USSA) have provided security guard services to private and public entities and individuals throughout

---

[1] Any finding of fact deemed to be a conclusion of law is incorporated into the conclusions of law. Any conclusion of law deemed to be a finding of fact is incorporated into the findings of fact.

the United States for more than 60 years. Dkt. 132 (MSJ Order) at 1. Allied Universal acquired Plaintiffs in 2018. Tr. 158:18-19.[2]

2. Defendant Randy Andrews is an individual who resides in California. Dkt. 144-1 at 2 (Stipulated Facts) ¶ 5a. Andrews was the Chief Executive Officer, President, and founder of Andrews International, Inc. (AI). Tr. 26:13-19.

3. On January 17, 2012, Plaintiffs, Andrews, and Andrews International, Inc. (AI) entered into a Stock Purchase Agreement (SPA). MSJ Order at 1-2; Ex. 5 (SPA). There were several parties to the SPA. Plaintiffs (as Parent) and American Premier Security, Inc. (as Buyer) agreed to purchase all of the stock of Andrews Holdings, Inc., a holding company that was the ultimate parent to several Andrews-named entities including Andrews International Holdings, LLC (AIH) and AIH's wholly-owned subsidiaries, AI, and Andrews International Government Services. MSJ Order at 2.

4. As a result of the SPA, Plaintiffs acquired AI and its parent holding companies, Andrews International Holdings, LLC and Andrews Holdings Co. Tr. 31:18-32:8.

5. The SPA effectively transferred all of AIH's rights, property, and interests to the Plaintiffs. These included, among other things, all trademarks, copyrights, and Internet domain names owned by AIH and its subsidiaries. Tr. 32:4-8, 33:2-7; see also SPA at 20-21. Schedule 4.11 to the SPA identified all intellectual property owned by AIH and its subsidiaries. Ex. 6 at 71.

6. Andrews consented to the SPA and is a party to the SPA as a "Rollover Seller." Tr. 32:1-3; SPA at 68.

7. Section 11.18 of the SPA provides:

> Use of Company Name. Effective as of the Closing Date, Buyer hereby agrees, that Seller may list the Company's

---

[2] All references to "Tr." refer to the trial transcripts at docket numbers 157-58.

2

> name in a form mutually agreed with the Company (such agreement not to be unreasonably withheld, conditioned or delayed by the Company) on its printed materials and website and in other forms and media for the purpose of making truthful statements that Seller or Affiliates (i) previously owned a controlling interest in the Company and is Subsidiaries and (ii) continue to own an indirect investment in the Company and its Subsidiaries. For the avoidance of doubt, nothing contained herein will waive or restrict or otherwise limit any rights that Audax or any of its Affiliates may have under applicable law or otherwise, including the right to use the Company Name in a descriptive manner or for any nominative fair use or fair use. Except as provided in this Section 11.18, none of the Seller, its parent entity or any of their Affiliates shall be entitled at any time ten days after the Closing Date to use the corporate name ANDREWS, used alone or in combination with any other word or design.

SPA § 11.18; <u>see also</u> Stipulated Facts ¶ 5b.

   8. Section 11.03 of the SPA provides:

> Prevailing Party. In the event of a dispute between any of the parties with respect to obligations under this Agreement, the prevailing party in any action or proceeding in any court or arbitration in connection therewith will be entitled to recover from such other party its costs and expenses, including reasonable legal fees and associated court costs.

SPA § 11.03; <u>see also</u> Stipulated Facts ¶ 5c.

B.   **Andrews' Use of the ANDREWS Corporate Name**

   9.   On December 29, 2017, Articles of Organization for Andrews Security, LLC were filed with the California Secretary of State. MSJ Order at 3. On March 22, 2018, Andrews Global Security, LLC converted to Andrews Global Security, Inc. (Andrews

3

Global or AGS).  Id.  Andrews Global described itself as a "security services" business.  Id.

10. Andrews Global held Andrews out as the company's CEO, and Andrews held himself out as the CEO of Andrews Global to prospective clients, insurers, and public forums such as the Andrews Global website.  Id. at 19.

11. Andrews was using the ANDREWS corporate name in connection with Andrews Global no later than July 2018.  Id. at 17-19; Tr. 39:11-13, 40:7-13, 41:22-42:2, 43:11-22, 47:7-22, 50:22-52:18, 76:5-12, 89:2-8; Ex. 13.

12. Andrews reviewed and edited Andrews Global materials for prospective customers.  Tr. 46:14-22, 48:12-49:2, 65:11-20, 69:19-70:6.  Andrews instructed that Andrews Global's proposals to prospective customers be made to "look more like a name change" from AI to Andrews Global because the prospective customer "kn[e]w next to nothing about USS or AI US."  Tr. 47:7-49:19; Ex. 36 at 1.

13. Andrews Global's proposals identified Andrews as "the man behind the Andrews brand."  Exs. 19 at 9, 30 at 4, 38 at 4, 38 at 7.

14. Andrews Global materials ascribed value to the ANDREWS corporate name, often referring to the "Andrews brand" or "Andrews security brand."  Exs. 17 at 15-16, 19 at 8-9, 30 at 2, 30 at 4, 30 at 8, 34 at 9, 34 at 11, 38 at 4, 38 at 7.  The materials described the ANDREWS corporate name as the "most trusted name in Hollywood security for over 30 years," "trusted by businesses across the country and around the world for decades," being known for "best-in-class customer service," and as "one of the oldest and most-respected names in security."  Exs. 17 at 15-16, 19 at 8-9, 30 at 2, 30 at 4, 29 at 7, 30 at 8, 31 at 2, 32 at 5, 33 at 3, 34 at 9, 34 at 10-11, 38 at 4, 38 at 7, 39 at 4.

15. Andrews Global materials also described the Andrews brand as having experienced "stellar success and growth" and

4

described Andrews Global as the "next generation" of AI. Exs. 17 at 6, 17 at 17, 19 at 6, 19 at 9, 29 at 33, 30 at 4, 30 at 8, 31 at 26, 32 at 31, 34 at 7, 34 at 10, 38 at 7, 39 at 24.

16. Andrews Global's proposals falsely identified Andrews Global Security as being "the company" first selected as the customer's security partner and stated that certain clients had been "flagship customer[s] for the Andrews brand." Exs. 38 at 4, 30 at 2; Tr. 54:18-21, 62:10-63:1, 63:13-16, 66:19-67:24.

17. After Andrews Global entered the market, Plaintiffs and their parent company, Allied Universal, had to compete against Andrews Global, which heavily used the ANDREWS corporate name, in competitive bids for work. Tr. 95:18-97:13, 99:25-100:4; 101:11-12:3;152:1-153:11; 235:24-237:8.

## II. CONCLUSIONS OF LAW

18. This Court has jurisdiction over the parties and the subject matter of this litigation. 28 U.S.C. § 1332.

19. This district is the proper venue for this litigation because the Southern District of New York transferred the case to this Court pursuant to 28 U.S.C. § 1404. Dkt. 76.

20. New York law applies to the interpretation of the SPA because of the choice of law provision contained in the SPA. MSJ Order at 11.

21. Plaintiffs have standing to recover damages in this breach of contract action because Plaintiffs were parties to the contract at issue in this litigation. See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 174 (2d Cir. 2005) ("There is no doubt that an organization may sue on its own behalf for injuries it has sustained.").[3]

---

[3] Defendant argues that Plaintiffs did not sustain any damages because after Defendant breached the SPA, Allied Universal purchased Plaintiffs. Dkt. 163

22. Plaintiffs were required to establish, by a preponderance of the evidence, every element of their claim for breach of contract. See In re Exxon Valdez, 270 F.3d 1215, 1232 (9th Cir. 2001) ("The standard of proof generally applied in federal civil cases is preponderance of evidence").

23. To prevail on their claims for breach of contract under New York law, Plaintiffs must prove: "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." Terwilliger v. Terwilliger, 206 F.3d 240, 245-46 (2d Cir. 2000) (quoting First Invs. Corp. v. Liberty Mut. Ins., 152 F.3d 162, 168 (2d Cir. 1998)).

24. On December 27, 2021, this Court determined that Andrews breached the SPA, and granted Plaintiffs' motion for partial summary judgment as to liability. MSJ Order at 19.

25. The goal of damages for breach of contract under New York law is to place the non-breaching party in the position it would have found itself had the contract been performed. Boyce v. Soundview Tech. Grp. Inc., 464 F.3d 376, 384 (2d Cir. 2006) (citing Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 196 (2d Cir. 2003); see also Wallace Steel, Inc. v. Ingersoll–Rand Co., 739 F.2d 112, 115 (2d Cir. 1984).

26. "Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach directly and proximately caused his or her damages." Nat'l Market Share v. Sterling Nat'l Bank, 392 F.3d 520, 525 (2d Cir. 2004). Damages that are "so remote as not to be directly traceable to the breach, or . . . may be the result of other

---

at 8. Defendant argues that because Allied Universal was unaware of Defendant's breach, "Plaintiffs received the full value for their companies' assets from Allied, undiminished by whatever incursion into the corporate name ANDREWS took place by the hands of Defendant or AGS." Id. at 9. Defendant cites no authority to support this position. The Court does not find this argument persuasive.

intervening causes . . . cannot be allowed." Id. at 526; see also Diesel Props S.r.l. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 53 (2d Cir. 2011).

27. Plaintiffs bear the burden of showing that Andrews' breach of the SPA through his use of the ANDREWS corporate name caused Plaintiffs' damages.

28. The parties introduced documentary and testimonial evidence that Andrews used the ANDREWS corporate name in Andrews Global's proposals for prospective customers, and that Plaintiffs had to compete against Andrews Global in competitive bid processes.

29. Andrews testified that he was involved with formation of and selecting the name for Andrews Global. Tr. 43:11-22. He testified that he attended the "AGS ALL Hands Meeting" on July 25, 2018 for Andrews Global. Tr. 41:1-18. He testified that he personally instructed Andrews Global employees to make Andrews Global looks like a name change from AI in its customer proposals. Tr. 47:7-22. Plaintiffs also submitted documentary evidence in support. Ex. 36 at 1 (July 18, 2018 email from Andrews to his assistant requesting that another name be added to the "AGS ALL Hands Meeting" invitation).

30. Andrews testified that he reviewed and edited Andrews Global materials for prospective customers. Tr. 46:14-22, 48:12-49:2, 65:11-20, 69:19-70:6. He testified to being involved in pitches to prospective customers on behalf of Andrews Global. Tr. 50:22-17, 52:5-15.

31. The evidence submitted by Plaintiffs establishes that Andrews' use of the ANDREWS corporate name deprived Plaintiffs of the benefit of the exclusive use of the ANDREWS corporate name as provided in section 11.18 of the SPA. As a result, Plaintiffs lost the value of the contractual right to exclude Andrews from using the ANDREWS corporate name. Plaintiffs have established causation by a preponderance of the evidence.

32. "In an action for breach of contract, a plaintiff may seek two distinct categories of damages: (1) general or market damages; and (2) special or consequential damages. A plaintiff seeks general damages when trying to recover the value of the promised performance." Schonfeld v. Hilliard, 218 F.3d 164, 175 (2d Cir. 2000) (citations omitted). "[S]uch damages are measured by the difference between the contract price and the market value of the goods at the time of the breach." Id. at 175-76. Special or consequential damages, "on the other hand, seek to compensate a plaintiff for additional losses . . . incurred as a result of the defendant's breach," such as lost profits or the loss of an income-producing asset that was in plaintiff's possession prior to the breach. Id. at 176.

33. Plaintiffs have a choice in selecting the damages they claim and are not required to claim lost profits. See, e.g., id. (noting that plaintiff-appellant was "seeking two separate and distinct categories of consequential damages: (1) lost profits; and (2) 'hybrid' damages for the market value of a lost income-producing asset," and that his inability to recover damages for lost profits did not impair his ability to claim hybrid damages).

34. Plaintiffs here seek to recover lost asset damages for the loss of the protections afforded to them under section 11.18 of the SPA, an intangible asset in their possession prior to Andrews' breach.

35. In order to recover damages under the lost asset value theory, "a plaintiff must prove that liability for the loss of the asset was within the contemplation of the parties at the time the contract was made, and the asset's value should be proven with reasonable certainty." Id. at 177.

36. It is clear from the plain language of the SPA that the parties intended to prohibit Andrews from using the ANDREWS corporate name in business. MSJ Order at 16. Although not expressly stated in the SPA, Andrews' liability for any losses

8

resulting from his use of the ANDREWS corporate name was within the contemplation of the parties when the SPA was prepared.

37. "When the defendant's conduct results in the loss of an income-producing asset with an ascertainable market value, the most accurate and immediate measure of damages is the market value of the asset at the time of breach – not the lost profits that the asset could have produced in the future." Schonfeld, 218 F.3d at 176. "The market value of an income-producing asset is inherently less speculative than lost profits because it is determined at a single point in time. It represents what a buyer is willing to pay for *the chance* to earn the speculative profits." Id. at 177.

38. If an asset has a determinable market value, "a plaintiff may seek to recover that value whether the asset is 'tangible or intangible property or almost any kind of contract right.'" Id. (citation omitted).

39. In cases involving "unique or intangible assets, New York courts have embraced the hypothetical market standard" established by the Supreme Court, which is the "price at which the property would change hands between a willing buyer and a willing seller . . . ." Id. at 178 (citing United States v. Cartwright, 411 U.S. 546, 551 (1973)). Courts may look to such factors as expert testimony, prior sales history, and evidence of sales of comparable assets to determine an asset's value at the time it was lost. Id. "Indeed, it is well-established that a recent sale price for the subject asset, negotiated by parties at arm's length, is the 'best evidence' of its market value." Id. (citation omitted).

40. Once a plaintiff has produced such evidence, the burden is on the defendant to demonstrate "special circumstances which would negate [the relevance] of a prior arm's-length purchase price." Id. at 179.

41. The Court considers whether Plaintiffs have proven the value of their lost asset with reasonable certainty.

42. Plaintiffs submitted both documentary and testimonial evidence that purported to establish the value of their lost asset, the contract right provided in section 11.18 of the SPA. Plaintiffs submitted expert testimony and an expert report prepared by George Miller.

43. Miller identified Andrews' breach as "the taking of the Andrews name." Ex. 1 at 4. Miller contended that the asset Plaintiffs lost was the ANDREWS corporate name protected by Section 11.18 of the SPA, which prohibited Andrews from using the name. Miller equated the contractual right protected in section 11.18 with the ANDREWS corporate name. Tr. 206:1-6.

44. The contractual right to exclude Andrews from using the ANDREWS corporate name and the ANDREWS corporate name are not one and the same. The value of these assets is not necessarily equal. Equating them without explanation is speculative. Although there may be value in preventing specific persons from using a trademark or trade name, a trademark or trade name has value beyond such a limit on its use.

45. Miller contended Andrews' breach of section 11.18 of the SPA completely eviscerated the value of the ANDREWS corporate name for Plaintiffs. Tr. 206:7-24, 222:5-7.

46. At the same time, Miller concluded the ANDREWS name did not decrease in value between 2012 and the time of the breach in 2018 because USSA did not record any impairment to intangible assets. Ex. 1 at 8. Miller also cited Andrews Global's use of the ANDREWS corporate name in its proposals to prospective customers in 2019 as an indication that the ANDREWS corporate name held its value over time. Id.

47. Based on this assessment that the value of the ANDREWS name did not diminish between the execution of the SPA in 2012 and the time of Andrews' breach in 2018, Miller concluded that it was reasonable to rely on the value of the ANDREWS corporate

name at the time the SPA was executed in assessing damages. Id. at 7-8.

48. Plaintiffs argue that although the ANDREWS corporate name retained its value from the time of the SPA through Andrews' breach, the value was eviscerated for them because Andrews "took" the name. Plaintiffs cannot have it both ways. Per the lost asset value approach, damages are measured by the market value of the asset at the time of breach, where the breach deprives a plaintiff of an asset. Schonfeld, 218 F.3d at 176, 178. Loss is complete deprivation.

49. Here, Plaintiffs were not completely deprived of the ANDREWS corporate name. Plaintiffs did not lose their right to use the ANDREWS corporate name, nor did they lose the ability to use the ANDREWS name. Tr. 215: 9-14. And the ANDREWS corporate name purportedly did not lose its value, even after Andrews' breach.

50. Plaintiffs did not establish that the complete value of the ANDREWS corporate name was eviscerated. Plaintiffs did not establish that it was reasonable to substitute the value of their lost asset – the contract right provided in section 11.18 of the SPA – with the entire value of the ANDREWS corporate name in calculating damages.

51. Furthermore, compensating Plaintiffs for the entire value of the ANDREWS corporate name would place Plaintiffs in a better economic position than they would be in had Andrews complied with the SPA. Plaintiffs would receive compensation for the value of the ANDREWS name while retaining the rights to the name and continuing to use the name with its purportedly undiminished value.

52. Assuming the contract right provided in section 11.18 of the SPA and the ANDREWS corporate name were one and the same, and that Andrews' breach eviscerated the value of Plaintiffs' asset, Plaintiffs still did not prove the value of their lost asset to a reasonable certainty.

11

53.     Miller determined that the value of all the intellectual property that Plaintiffs acquired under the SPA was entirely attributable to the ANDREWS corporate name, and calculated damages based on that figure – the purported value of the ANDREWS corporate name.

54.     AI's Consolidated Balance Sheet dated October 31, 2011 valued "Trade Name" at $40,500,000. Ex. 6 at 10; Tr. 184:21-24. This value was reflected in AI's audited financial statement for the year ending on December 31, 2010. Ex. 6 at 17. Miller relied on the value of "Trade Name" reflected in these financial statements for comparison purposes in his analysis. Tr. 186:8-16.

55.     USSA's Consolidated Financial Statements as of December 27, 2012, valued the "Intangible Assets" acquired as part of the SPA at $102,634,000. The "excess purchase price attributed to goodwill" was $30,084,000. Ex. 24 at 18.

56.     Miller relied on Adams Capital Inc.'s Purchase Price Allocation report, a valuation study of the value of the assets acquired as part of the SPA, to determine what portion of the reported intangible assets was attributable to the ANDREWS corporate name. Tr. 193:4-10; see also Ex. 8 (Adams Capital Report).

57.     The Adams Capital Report valued "Trademarks" at $14,362,217 and "Implied Goodwill" at $11,940,696. The report did not value trade names separately. Adams Capital Report at 3.

58.     The report described the "Trademarks" asset as including various active trademarks, including Andrews International (Block Letters), Andrews International (Design), Asset Protection Team, Asset Protection Team (APT Design), and Verasys, as well as several domain names. Id. at 38. The report noted that "[t]he primary trademark, Andrews International, is viewed favorably and is very well known, especially on the west coast where it was founded." Id.

59. The Adams Capital Report did not value the ANDREWS corporate name as a distinct asset. Id.

60. Miller contended that Adams Capital's $14,362,217 valuation of "Trademarks" was primarily attributed to the ANDREWS corporate name. Miller contended that even though there were other brands and trade names owned by the AIH entities and referenced in the report, they had a de minimis value. Tr. 195:10-196:12; Ex. 1 at 5.

61. Miller relied on a discussion with John Harford, who at the time of the SPA was USSA's Chief Development Officer, in which Harford stated that Plaintiffs intended to use only the ANDREWS name, to conclude that the "value of the trade name asset within USSA's other intangible asset balance sheet category would be for the Andrews name and not for Andrews International legacy brands." Id.

62. Miller also looked at the breakdown of intangible assets reported in USSA's 2012 Consolidated Financial Statements to determine the value of the ANDREWS trade name. The total value of intangible assets reported at the end of 2012 was $442,173. Ex. 24 at 3. Note 6 indicated that at the end of 2011, the value of "trademarks" on USSA's books was $59,040,000 and at the end of 2012, the value was $73,652,000. Id. at 22. Miller contended that the difference between the 2011 and 2012 figures was the acquisition of the $14.3 million trademark-trade name under the SPA, with a de minimis amount reflecting the value of a trademark acquired in another acquisition. Tr. 197:23-198:21.

63. Miller determined that it was reasonable to conclude that $14,362,217 was the value of the Andrews trademarks at the time of the SPA. Ex. 1 at 5.

64. The Court does not agree that Adams Capital's $14,362,217 valuation of "Trademarks" was almost entirely attributable to the ANDREWS corporate name. First, trademarks and trade names are different types of intellectual property. Furthermore, it is not clear

13

to the Court that the various domain names and trademarks identified in the Adams Capital Report as forming the basis for the $14,362,217 valuation had a de minimis value. Finally, even if Plaintiffs intended to use only the Andrews name, the Adams Capital Report did not limit its valuation of trademarks acquired through the SPA only to the ANDREWS name.

65. Plaintiffs did not establish that it is reasonable to rely on Adams Capital's valuation of all trademarks and domain names acquired in the SPA for the value of the ANDREWS corporate name.

66. Plaintiffs did not establish the reasonableness of relying on the value of the ANDREWS corporate name in order to calculate damages for the loss of their right to exclude Andrews from using the name. The Court finds that Plaintiffs have not proven lost asset value damages with reasonable certainty.

67. "Under New York law, nominal damages are always available in a breach of contract action even if a party cannot prove general or consequential damages." Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co., 976 F.3d 239, 247 n.10 (2d Cir. 2020).

68. Because Plaintiffs have not proven the amount of their damages with reasonable certainty, their request for $18,086,232 in damages is DENIED. Because Plaintiffs have not proven damages in any other amount with reasonable certainty, Plaintiffs are awarded $1 in nominal damages.

69. Pursuant to section 11.03 of the SPA, as the prevailing parties Plaintiffs are entitled to reasonable legal fees, costs, and expenses.

### III. CONCLUSION

Judgment shall be entered in favor of Plaintiffs U.S. Securities Holdings, Inc. and U.S. Security Associates Holdings Inc. and nominal damages are awarded on their breach of contract claim.

IT IS SO ORDERED.


Date: August 15, 2022

                                              Dale S. Fischer
                                              United States District Judge